IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| ERICK SANDERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 19-cv-01271-TMP |
| | ) |
| ANDREW SAUL, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER AFFIRMING THE COMMISSIONER'S DECISION

Before the court is plaintiff Erick Sanders's appeal from a
final decision of the Commissioner of Social Security
("Commissioner") denying his application for disability insurance
under Title II of the Social Security Act ("the Act"), 42 U.S.C.
§§ 401-34.  The parties have consented to the jurisdiction of the
United States magistrate judge under 28 U.S.C. § 636(c).  (ECF No.
12.)  For the reasons below, the Commissioner's decision is
AFFIRMED.

I.   FINDINGS OF FACT

Erick Sanders is a fifty-four-year old man suffering from
several ailments, including obesity, degenerative disc disease,
degenerative joint disease, and a hernia.  (R. at 24.)  Though he
has a high school education, Sanders has not held any gainful

employment within the past fifteen years. (R. at 24, 34-35.)
Before then, he worked as a warehouse manager and at a body shop.
(R. at 223.) On September 23, 2004, an Administrative Law Judge
("ALJ") found that Sanders had been legally disabled since May 1,
2002. (R. at 16, 52.) However, on November 9, 2016, a subsequent
ALJ ("ALJ Reap") found that Sanders had lost his disability status
by November 1, 2013, because his physical therapy had resulted in
"significant improvements in mobility and activities of daily
living." (R. at 16, 55, 60). Though a magnetic resonance imaging
("MRI") scan in 2014 showed that Sanders was still suffering from
multilevel degenerative disc disease, ALJ Reap noted that Sanders
was physically capable of performing medium work. (R. at 55.)
Sanders did not appeal ALJ Reap's decision. (R. at 16.)

On December 20, 2016, Sanders went to the emergency room ("ER")
at Jackson Madison County General Hospital, complaining of back and
neck pain. (R. at 19.) After an examination, the ER doctor noted
that Sanders was exhibiting symptoms indicative of neck pain that
had improved with treatment. (R. at 19.) The ER doctor sent
Sanders home with a prescription and instructions to meet with his
primary care provider. (R. at 19.)

On January 20, 2017, Sanders filed the application for
disability insurance under Title II of the Act that is presently
before the court, alleging a disability beginning on March 1, 2014.
(R. at 16.) On a Function Report-Audit form dated May 11, 2017,

Sanders indicated that he had lost the ability to use his dominant hand and was struggling to maintain his personal care. (R. at 19.) He also indicated that, while he cannot walk to get groceries or stand to perform household chores, he goes outside every day on his own and that he travels both by car and on foot. (R. at 233-34.) At the request of the SSA, Sanders went to Dr. Donita Keown for a physical examination on June 6, 2017. (R. at 20.) Dr. Keown observed that Sanders:

> approached the reception desk demonstrating [an] ability to ambulate independently at a brisk pace. He demonstrated normal speech as he interrogated our receptionist regarding examination and [our] consultative examiner. I observed this claimant ambulating briskly through clinic corridors. He did not require devices. He is darkly suntanned and heavy set. It is noted that while he was in the facility, I have observed this gentleman utilizing his right upper extremity and hand to make notes on a piece of paper.

> Out of doors, claimant is observed standing on one foot . . . stretching and exercis[ing]. He is observed in the waiting area pulling a second chair in front of him[,] elevating his lower extremities[, and] demonstrating bilateral negative SLRs. He is observed turning, moving multiple pieces of furniture, walking through the clinic corridors, and turning door knobs. It is noted that he has attempted [to] intimidate his consultative physician and her assistant[.] [C]laimants and claimant family members in waiting area were very upset and frightened. We have asked this claimant to leave the clinic on a voluntary basis or else police will be summoned.

(R. at 20.) Based solely on her observations of Sanders in the waiting area of her clinic (she was unable to personally examine him), Dr. Keown proposed that Sanders did not need any restrictions

- 3 -

on his work ability.  (R. at 20.)  Four other doctors reviewed Sanders's medical records over the remaining months in 2017.  Two of the doctors, Dr. Rebecca Hansmann and Dr. Stacy Koutrakos, concluded that there was insufficient evidence to render an opinion about Sanders's mental capabilities.  (R. at 20.)  The other two doctors, Dr. Joseph Curtsinger and Dr. Morris Susman, concluded that Sanders did not have a "severe" physical impairment that would restrict his ability to work.  (R. at 20.)

On October 12, 2018, Sanders was examined by Dr. John Woods. (R. at 20.)  Sanders drove himself to the appointment.  (R. at 500.)  After examining Sanders and reviewing his medical history, Dr. Woods noted that "[Sanders] got onto and off of the exam table without difficulty," that his "[h]ip abduction was mildly decreased bilaterally due to his obesity, but he otherwise had full range of motion in all tested joints," that he had "no joint swelling . . . [or] . . . muscle dystrophy," and that his "[g]ait was normal." (R. at 500.)  Dr. Woods also noted that Sanders initially refused to sit in the examination room because he was in too much pain and instead "stood leaning over the exam table during much of [the] evaluation."  (R. at 500.)

Dr. Woods made several opinions regarding Sanders's work capabilities based on Sanders's surgical history, an MRI taken in February 2014 (the same MRI considered by ALJ Reap) that showed Sanders's degenerative disc disease, and Sanders's symptoms of pain

in his arms, legs, neck, back, and spine.  Dr. Woods opined that Sanders could lift up to ten pounds occasionally but less than ten pounds frequently, that he could stand or walk for five hours each day for up to an hour at a time, and that he could sit for seven hours each day for up to thirty minutes at a time.  (R. at 21.) Dr. Woods further opined that Sanders could "handle and finger" frequently on his right side, that he could reach occasionally with his right arm and frequently with his left, that he could push and pull less than occasionally on his right and occasionally on his left, and that he could occasionally operate foot controls with either foot.  (R. at 21.)  While he could never climb ladders or scaffolds and could kneel or crawl less than occasionally, Dr. Woods opined that Sanders could balance and climb stairs or ramps. (R. at 21.)  Dr. Woods also opined that Sanders could occasionally operate a motor vehicle.  (R. at 21.)

The Social Security Administration ("SSA") denied Sanders's application for disability benefits initially and upon reconsideration.  (R. at 16.)  At Sanders's request, a hearing was held before an ALJ on November 16, 2018.  (R. at 16.)  Sanders and Charles Wheeler, a vocational expert, testified at the hearing. (R. at 16.)  At the hearing, the ALJ posed Wheeler with three hypotheticals dealing with potential job opportunities for individuals with similar capabilities to Sanders.  (R. at 39-44.)

Under the first hypothetical, Wheeler was asked whether an individual who had no prior work history but possessed the residual functional capacity ("RFC") to perform medium work – albeit with several physical limitations – could perform any specific jobs. (R. at 39-40.)  Wheeler testified that such an individual could work as a hand packager, an automobile detailer, or a laboratory equipment cleaner. (R. at 40.)  This hypothetical was based on ALJ Reap's findings in 2016. (R. at 39.)  Under the second hypothetical, Wheeler was asked whether an individual with no prior work history but the RFC to perform medium work – without any limitations – could perform any specific jobs. (R. at 41.)  Wheeler testified that such an individual had the same job prospects as an individual under the first hypothetical. (R. at 41.)  Under the third hypothetical, Wheeler was asked about the job prospects for an individual subject to Dr. Woods's recommended limitations. (R. at 41.)  Wheeler testified that "there would be no jobs that could be performed." (R. at 43.)

At the outset of her opinion, the ALJ noted that she was bound by ALJ Reap's findings of fact because Sanders's "impairments neither improved nor worsened." (R. at 21.)  In weighing the evidence, the ALJ determined that Wheeler's testimony was consistent with information contained in the Directory of Occupational Titles. (R. at 23.)  Regarding the four physicians, the ALJ first noted that Sanders did not seek treatment from any

of the four physicians whose opinions she considered.  (R. at 21.)
She then went on to give each opinion little weight in her analysis.
(R. at 22.)  For the ALJ, Dr. Keown's opinion merited little weight
because she only had a limited opportunity to observe Sanders.  (R.
at 22.)  Similarly, the ALJ afforded Dr. Woods's opinion little
weight because he relied, in part, on Sanders's subjective symptoms
rather than objective medical evidence.  (R. at 22.)  The ALJ also
noted that Dr. Susman's and Dr. Curtsinger's opinions deserved
little weight because they were too optimistic when compared to the
rest of the record.  (R. at 22.)

     As for assessing Sanders's symptoms of pain, the ALJ applied
a two-step process, first determining if Sanders suffered from an
impairment that might cause the alleged symptoms and, second,
determining if the impairments could reasonably be expected to
cause his alleged symptoms of pain.  (R. at 22.)  The ALJ found
that Sanders's degenerative disc disorder was likely causing his
pain but also found that "the intensity, persistence, and limiting
effects" were inconsistent with his own testimony and the objective
medical evidence in the record.  (R. at 22.)  Specifically, the ALJ
considered that Sanders alleged he was unable to write or prepare
meals for himself, but Dr. Keown observed him writing and
rearranging furniture.  (R. at 22.)  The ALJ also noted Sanders,
while stating that he shopped for groceries by himself on occasion,

claimed that he was unable to go grocery shopping because he could only walk short distances.  (R. at 22.)

The ALJ applied the Five-Step analysis to determine if Sanders was disabled.  (R. at 17-18.)  At Step One, the ALJ found that Sanders "has not engaged in substantial gainful activity since January 20, 2017, the date of his application for supplemental security income[.]"  (R. at 24.)  At Step Two, the ALJ found that since January 20, 2017, Sanders has suffered "'severe' impairments, including degenerative disc disease, degenerative joint disease of the shoulder, obesity, and hernias[.]"  (R. at 24.)  At Step Three, the ALJ found that Sanders's impairment does not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 24.)  Accordingly, the ALJ had to then determine whether Sanders retained the RFC to perform past relevant work or could adjust to other work.  (R. at 24.)  The ALJ found that:

> Since January 20, 2017, [Sanders] has had the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he was limited to occasionally lifting a maximum of thirty pounds and frequently lifting a maximum of fifteen pounds; frequently balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; only occasionally climbing ladders, ropes or scaffolds; and avoiding concentrated exposure to extreme cold and vibrations.

(R. at 24.)  The ALJ then found at Step Four that Sanders did not have any past relevant work experience. (R. at 24.)  In assessing

Step Five, the ALJ considered Sanders's age, education, work experience, and RFC and found that Sanders was "capable of making a successful adjustment to other work that has existed in significant numbers in the economy," such as working as a hand packager, an automobile detailer, or a laboratory equipment cleaner. (R. at 23-24.)  Consequently, the ALJ found that Sanders was not disabled and dismissed Sanders's request for disability insurance benefits. (R. at 24-25.)

On November 19, 2019, Sanders filed the instant action. (ECF No. 1.)  In his brief filed May 6, 2020, Sanders argues that the ALJ's decision cannot stand because her RFC is fundamentally flawed.  (ECF No. 20.)  According to Sanders, the ALJ did not properly explain why she gave little weight to several of the medical opinions in the record, namely that of Dr. Woods, Dr. Keown, Dr. Curtsinger, and Dr. Susman.  (ECF No. 20.)  Sanders further argues that the ALJ erred by not giving greater weight to Dr. Woods's recommended limitations and that, in light of this error, the ALJ did not have substantial evidence to support her decision. (ECF No. 20.)  The Commissioner filed a brief in response on June 5, 2020.  (ECF No. 21.)

## II.  CONCLUSIONS OF LAW

### A.  Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to

which he or she was a party.  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."   42 U.S.C. § 405(g).   Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision.  Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is more than a scintilla of evidence but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)).  If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support

a decision the other way." <u>Barker v. Shalala</u>, 40 F.3d 789, 794 (6th Cir. 1994) (quoting <u>Smith v. Sec'y of Health & Human Servs.</u>, 893 F.2d 106, 108 (6th Cir. 1989)).  Similarly, the court may not try the case <em>de novo</em>, resolve conflicts in the evidence, or decide questions of credibility.  <u>Ulman v. Comm'r of Soc. Sec.</u>, 693 F.3d 709, 713 (6th Cir. 2012) (citing <u>Bass v. McMahon</u>, 499 F.3d 506, 509 (6th Cir. 2007)).  Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 528 (6th Cir. 1997); <u>Crum v. Sullivan</u>, 921 F.2d 642, 644 (6th Cir. 1990).

**B.   The Five-Step Analysis**

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).  Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual),

> "work which exists in the national economy" means work
> which exists in significant numbers either in the region
> where such individual lives or in several regions of the
> country.

Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to Social Security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. See 20 C.F.R. §§ 404.1520 & 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the

Social Security Regulations. See 20 C.F.R. §§ 404.1520(d), 404.1525, & 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv) & 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of not disabled must be entered. Id. But if the ALJ finds the claimant unable to perform past relevant work, then at the fifth step the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g)(1), & 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. 20 C.F.R. § 404.1520(a)(4).

## C.   The ALJ's Residual Functional Capacity Assessment

In formulating an RFC assessment, "the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." Eslinger v. Comm'r of Soc. Sec., 476 F. App'x 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)); see also Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010).

> An opinion from a treating physician is 'accorded the most deference by the SSA' because of the 'ongoing treatment relationship' between the patient and the opining physician.  A nontreating source, who physically examines the patient 'but does not have, or did not have[,] an ongoing treatment relationship with' the patient, falls next along the continuum.  A nonexamining source, who provides an opinion based solely on review of the patient's existing medical records, is afforded the least deference.

Norris v. Comm'r of Soc. Sec., 461 F. App'x 433, 439 (6th Cir. 2012) (quoting Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007)) (internal citations omitted).  "ALJs must evaluate every medical opinion [they] receive by considering several enumerated factors, including the nature and length of the doctor's relationship with the claimant and whether the opinion is supported by medical evidence and consistent with the rest of the record."  Stacey v. Comm'r of Soc. Sec., 451 F. App'x 517, 519 (6th Cir. 2011).  When an ALJ rejects the opinion of a medical expert who is not a treating physician, the decision "must say enough to allow the appellate court to trace the path of [the ALJ's] reasoning" but need not be "an exhaustive factor-by-factor analysis."  Id. (internal citation and quotation omitted); Francis v. Comm'r of Soc. Sec., 414 F. App'x 802, 804 (6th Cir. 2011); see also Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010) (holding that the Act's requirement for an ALJ to give good reasons for rejecting a treating physician's opinions does not apply to an examining physician).

1.   <u>Dr. Susman and Dr. Curtsinger</u>

Both Dr. Susman and Dr. Curtsinger provided medical opinions based exclusively on their review of Sanders's medical records, and both observed that Sanders did not have a severe impairment. Neither physician saw Sanders and thus both are nonexamining physicians under the Act.   See <u>Norris</u>, 461 F. App'x at 439.   The ALJ noted that both opinions were too optimistic based on, and thus inconsistent with, the record as a whole.   As a result, the undersigned can "trace the path of [the ALJ's] reasoning," and the ALJ did not err in giving little weight to their opinions.   <u>Stacey</u>, 451 F. App'x at 519.

2.   <u>Dr. Keown</u>

The ALJ gave Dr. Keown's opinion little weight because her examination of Sanders was "quite limited."   Dr. Keown did not personally treat Sanders and is, at most, an examining physician under the terms of the Act.   See <u>Norris</u>, 461 F. App'x at 439.   All of Dr. Keown's observations came while Sanders was in the waiting room at her office.   While the ALJ could have gone into more detail as to what exactly she meant by "quite limited," the ALJ had already described the circumstances of Sanders's visit with Dr. Keown and that she could only observe Sanders from afar.   See, e.g., <u>Crum v. Comm'r of Soc. Sec.</u>, 660 F. App'x 449, 457 (6th Cir. 2016) (holding that an ALJ does not need to reproduce every fact when explaining why a physician opinion is inconstant with the record, provided the

facts are listed elsewhere in the opinion); Forrest v. Comm'r of Soc. Sec., 591 F. App'x 359, 366 (6th Cir. 2014) ("[T]he ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."). The ALJ did not err in giving little weight to Dr. Keown's opinion.

3. Dr. Woods

Sanders argues that the ALJ decision lacks substantial evidence because the ALJ improperly gave Dr. Woods's recommendations little weight. Dr. Woods only saw Sanders one time and Sanders did not seek any treatment from him, making him an examining physician under the Act. See Norris, 461 F. App'x at 439. As a result, the ALJ was only required to "say enough to allow a reviewing court to trace the ALJ's reasoning." Jines v. Berryhill, No. 18-1234-TMP, 2019 WL 4644000, at *5 (W.D. Tenn. Sept. 24, 2019) (citing Stacey, 451 F. App'x at 519). An ALJ can "properly decline to accept limitations based on Plaintiff's subjective claims of symptoms." Rodgers v. Comm'r of Soc. Sec., No. 1:14-cv-01136-STA-cgc, 2017 WL 2438820, at *2 (W.D. Tenn. June 6, 2017); see also Griffith, 582 F. App'x at 564 ("[T]he ALJ is not required to simply accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence."); Bell v. Barnhart 148 F. App'x 277, 285 (6th Cir. 2005) ("Such [self-reports of symptoms] alone cannot support

- 16 -

a finding of impairment."); <u>Agnew v. Berryhill</u>, No. 16-1103-dkv, 2017 WL 8229593, at *7 (W.D. Tenn. Aug. 22, 2017) (finding that an ALJ properly gave a physician's medical opinion little weight because he only examined the claimant one time and based his recommendations on the claimant's subjective complaints). This court's role is not to reassess whether a physician opinion should have received more weight; it is merely to determine if the ALJ had substantial evidence to justify her decision. <u>See</u> <u>Walters</u>, 127 F.3d at 528.

The ALJ explored and explained Dr. Woods's examination in her Summary of the Facts and noted that his recommendations were based on Sanders's subjective symptoms of pain. In doing so, the ALJ set forth Dr. Woods's objective medical findings and found that they did not show Sanders's impairments either improving or worsening since ALJ Reap held that he was capable of performing medium work. <u>See</u> <u>Crum</u>, 660 F. App'x at 457; <u>Forrest</u>, 591 F. App'x at 366. Indeed, the only medical evidence utilized by Dr. Woods that was not considered by ALJ Reap was Sanders's alleged pain.[1] In reaching

---

[1]Dr. Woods also based his recommendations on Sanders's 2014 MRI documenting degenerative disc disease and his surgical history, both of which ALJ Reap considered when determining that Sanders was not disabled at the time. While an initial ruling on a disability does necessarily preclude a claimant from later requesting benefits under the same disability, the claimant must "present evidence of a change in condition or satisf[y] a new regulatory threshold." <u>Earley v. Comm'r of Soc. Sec.</u>, 893 F.3d 929, 932 (6th Cir. 2018); <u>see also</u> <u>Dugan v. Comm'r of Soc. Sec.</u>, 742 F. App'x 897, 901 (6th Cir. 2018) (quoting <u>Drummond v. Comm'r of Soc. Sec.</u>, 126 F.3d 837,

her conclusion, the ALJ did not dispute that Sanders was impaired or that his impairments caused him some pain; rather the ALJ was dubious as to the "intensity, persistence[,] and limiting effects of these symptoms" based on the available medical evidence and the record as a whole.  Consequently, the ALJ found that Dr. Woods was merely an examining physician, that his opinion was supported primarily by subjective pain and not objective medical evidence of any changed condition, and that his opinion was inconsistent with the rest of the record.  See Stacey, 451 F. App'x at 519.  This was a valid basis for the ALJ to award Dr. Woods's opinion little weight in her analysis.[2]

### III. CONCLUSION

---

842 (6th Cir. 1997)) ("[A]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.").

[2]Sanders further argues that Dr. Woods's opinion should have been given greater weight because it is supported by and consistent with both an MRI taken in 2014 that evidenced degenerative disc disease and Sanders's surgical history.  Because the ALJ did not err in electing to give Dr. Woods's opinion little weight, the court declines to consider whether these other medical records support a different outcome.  See Barker, 40 F.3d at 794 ("This court's review of the ALJ's findings is limited to an inquiry into whether they were supported by substantial evidence. 'If the answer to that question is 'Yes' [the court] may not even inquire whether the record could support a decision the other way.'") (quoting Smith v. Sec'y of Health and Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)) (internal citations omitted).

As discussed above, there is substantial evidence to support the ALJ's allocation of weight to the various physician opinions. As such, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

s/ Tu M. Pham_____
TU M. PHAM
Chief United States Magistrate Judge

October 26, 2020_____
Date